IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JESSE A. JORDAN, | ) | CASE NO. 5:25-cv-00964-JRA |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

**I.     Introduction**

Plaintiff, Jesse Jordan ("Jordan"), seeks judicial review of the final decision of the Commissioner of Social Security, denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

Jordan raises two issues on review of the Administrative Law Judge's ("ALJ") decision, arguing

1.     The ALJ erred at Step Five by rejecting the vocational opinion of Mr. C. Heartsill, and

2.     The ALJ erred at erred at Step Four and Step Five by creating an incomplete residual functional capacity ("RFC") and finding occupations exist in the national economy.

(ECF Doc. 8, p. 1).

Because the Administrative Law Judge ("ALJ") failed to apply proper legal standards with respect to the second issue, I recommend that the Commissioner's final decision denying Jordan's application for DIB be vacated and remanded for further consideration.

1

## II.      Procedural History

Jordan filed for DIB on March 29, 2023, alleging a disability onset date of January 10,

2017. (Tr. 176-77). The claim was denied initially and on reconsideration. (Tr. 59, 79). Jordan

then requested a hearing before and ALJ. (Tr. 94). Jordan, represented by counsel, and a

Vocational Expert ("VE") testified before the ALJ on April 17, 2024. (Tr. 32-58). On May 30,

2024, the ALJ issued a written decision finding Jordan not disabled. (Tr. 15-27). The Appeals

Council denied his request for review on April 8, 2025, making the hearing decision the final

decision of the Commissioner. (Tr. 1-6). Jordan timely filed this action on May 13, 2025. (ECF

Doc. 1).

## III.     Evidence

### A.      Personal, Educational, and Vocational Evidence

Jordan was born January 19, 1982. (Tr. 176). He was 34 years old on his alleged onset

date of January 10, 2017, making him a younger individual according to agency regulations. (Tr.

25). His date last insured ("DLI") is listed as December 31, 2022. (Tr. 17). He has at least a high

school education. (Tr. 26). He has past relevant work as a Security Guard, DOT #372.667-034.

SVP 4, light exertional level. (Tr. 25).

### B.      Relevant Medical Evidence

On January 23, 2017, Jordan attended an office visit with Erin M. Dean, M.D. seeking

evaluation of left foot pain following an injury that occurred on January 9, 2017. (Tr. 338). He

reported left foot pain and a large knot medially that he attributed to working 60 hours per week.

(*Id.*). He presented using a tall walking boot he had from a previous injury, and walked in

external rotation on the heel. (*Id.*). He noted occasional numbness and tingling in the foot, and

pain that started along the medial midfoot and extended proximally and distally. (*Id.*). He rated

2

the pain at a 4/10 currently, with a general range of 3-8/10, and described the pain as worse with weight bearing and walking. (*Id.*). He weighed 400 pounds. (Tr. 339). Examination showed tenderness to palpation at the medial and lateral jointlines, at the posterior tibial and achilles tendons, and at the posterior talofibular. (Tr. 340). There was also tenderness at the midfoot navicular and at all tarsal metatarsal joints. His left ankle was limited to 0º dorsiflexion, 30º plantarflexion and 25% inversion and eversion. (Tr. 340-41). Dr. Dean ordered an MRI of Jordan's left foot, recommended he continue wearing the boot for support, provided a lynco insert; he could ambulate as tolerated. (Tr. 341-42).

On February 1, 2017, Jordan underwent a left ankle MRI which revealed severe degenerative change of the medial ankle joint, with multiple bodies seen in the region of the deep fibers of the deltoid likely related to prior avulsive injury, and amorphous signal intensity likely related to chronic sprain/degeneration; osteochondral lesion of the lateral talar dome; findings most compatible with chronic sprain of the anterior talofibular ligament and calcaneofibular ligament; and small volume joint effusion with internal synoval proliferation. (Tr. 428).

At an office visit on February 14, 2017, Dr. Dean recorded that Jordan was still walking with a left tall walkerboot, and that the pain in his left ankle had improved with the use of Meloxicam. (Tr. 333). He reported he weighed 400 pounds. (Tr. 334). He continued to experience tenderness at the medial, lateral and anterior joint lines, and at all tarsal metatarsal joints. (Tr. 335). His left ankle dorsiflexion remained at 0º but his plantarlexion had improved to 45º, and his inversion and eversion were measured at 50%. (Tr. 335-36). Dr. Dean noted "significant arthritis in the ankle", but that Jordan would like to avoid surgery. (Tr. 336). An AFO brace was prescribed. (*Id.*). There were similar findings at a March 21, 2017 office visit, but the was some improvement in dorsiflexion to 5º. (Tr. 330).

Jordan reported at an April 24, 2017 office visit that he had been using his AFO brace for 1-2 hours at a time for about three or four weeks, and that he had been attending physical therapy. (Tr. 323). He has found that physical therapy increases his pain, but he has felt that his symptoms hve improved. (*Id.*). Examination showed an antalgic gait on the left and some edema, with continued tenderness to palpation at the medial and anterior jointlines, in the achilles and peroneal tendons and in the deltoid ligament, and dorsiflexion, platarflexion, inversion and eversion consistent with the previous visit. (Tr. 325).

On June 5, 2017, Jordan reported seeing improvement with physical therapy, and expressed continued disinterest in surgical options. (Tr. 318). At an August 7, 2017 office visit, Jordan reported he could stand for about 20 minutes before experiencing pain, and could walk for about 15 minutes. (Tr. 314). He had attended both water and land based therapy, and continued to have some swelling and pain ranging from 3-7/10. (*Id.*). His dorsiflexion, plantarflexion, inversion and eversion remained consistent, and he was assessed with left ankle arthritis and morbid obesity. (Tr. 316-17).

On October 9, 2017, Jordan reported he was walking 15 minutes every other day and gaining confidence, but his ankle flared up again when he walked for 45 mintues. (Tr. 309). At a December 11, 2017 appointment he noted his ankle will swell with increased activity, and that his pain ranged from 3-5/10. (Tr. 304.) Left tibialis posterior tendonitis was added to his assessment. (*Id.*). On March 12, 2018,  Jordan was continuing his water exercises and reported walking 15 minutes daily, weather permitting. (Tr. 299). He described his pain as ranging from 2-7/10. His plantarflexion had improved to 60°. (*Id.*).

No further care is seen in the record until February 15, 2022, when Jordan presented to Dr. Dean for evaluation of bilateral ankle pain. (Tr. 294). He was ambulating with a cane in his

right hand and wearing a fitted left foot brace, and reported right ankle pain intermittently for about a year. (*Id.*). He also reported left ankle pain around the medial malleolus with numbness in his toes. (*Id.*). He again weighed 400 pounds. (Tr. 295). He demonstrated a bilateral antalgic gait, and had tenderness to palpation at the first, second and third bilateral tarsal metatarsal, and at the left medial, lateral, anterior and posterior jointlines and the left posterior tibial tendon. (Tr. 296). He was measured with bilateral 5° dorsiflection, 50° right plantarflexion and 45° left plantarflexion, 75% bilateral inversion and 75% left ankle eversion. (*Id.*). He was assessed with arthritis of right ankle and right leg posterior tibial tendinitis. (Tr. 297). A left ankle x-ray showed arthritic change present at the tibiotalar joint especially medial with diffuse osteopenia. (Tr. 283). A right foot x-ray showed mild first MTR joint and first toe IP joint arthritis and posterior calcaneal enthesophyte with inflammatory changes along the haglunds posteriorly. (Tr. 284).

At a March 29, 2022 office visit, Jordan reported improvement in the right foot and ankle through physical therapy, pain medication, ice, elevation, rest and use of a TENS unit. (Tr. 286). He discussed weaning out of his boot and transitioning to a shoe with a powerstep insert. (Tr. 289). He was assessed with right leg posterior tibial tendinitis, right ankle arthritis, morbid obesity, arthritis of left ankle and left tibialis posterior tendonitis. (*Id.*).

Jordan attended an office visit with Christopher Tisdel, MD on December 29, 2022 and was assessed with left ankle posttraumatic arthritis and morbid obesity. (Tr. 360). Dr. Tisdel concurred with a treatment plan including custom bracing and anti-inflammatories. (*Id.*). Jordan indicated to Dr. Tisdel that he was not interested in surgical repair. (*Id.*). His weight remained 400 pounds. (Tr. 362). A left ankle x-ray showed a cortical irregularity of the medial malleolus likely representing remote healed fracture sequela; plantar calcaneal spur which can be

associated with plantar fasciitis and prominent cystic changes visualized in the medial malleolus that is nonspecific and may be degenerative in etiology. (Tr. 401). A right ankle x-ray was unremarkable. (*Id.*).

On March 28, 2023, Jordan attended an office visit with Edward Jastrzemski, M.D. and reported that his left ankle pain had been gradually worsening. (Tr. 474). He stated that if he had 25 minutes of direct pressure on his foot he would then be bedridden for two to three days. (*Id.*). Examination showed decreased left ankle range of motion, 5/5 strength and no tenderness to palpation. (Tr. 475).

At a September 28, 2023 appointment, Dr. Jastrzemski noted that Jordan was using custom-bracing with anti-inflammatories, and was following the P.R.I.C.E. protocol. (Tr. 466). Jordan again declined ankle fusion surgery. (*Id.*). He was seeing benefit from Mobic and a TENS unit. (*Id.*). His exercise was limited by his ankle. (*Id.*). On December 5, 2023, an updated left ankle x-ray showed mild to moderate osteoarthritis, posttraumatic left ankle, with little change since previous x-rays. (Tr. 479).

### C.    State Agency Reviewing Opinion Evidence

On May 17, 2023, state agency reviewing physician Gerald Klyop, M.D., opined that Jordan would be limited to work at a light exertional level, but with no more than four hours standing or walking in an eight-hour workday. (Tr. 66-67). Dr. Klyop would further restrict Jordan to frequent climbing of ramps or stairs, but no climbing of ladders, ropes or scaffolds; occasional kneeling, crouching or balancing, but no stooping or crawling; avoiding concentrated exposure to vibrations, and all exposure to hazards, machinery, heights or commercial driving. (Tr. 66-68). Dr. Klyop's opinion was affirmed by W. Scott Bolz, M.D. on reconsideration. (Tr. 75-76). State agency reviewing psychologist Kristen Haskins, Psy.D., opined on May 30, 2023,

that Jordan suffered from no severe mental health issues (Tr. 64-65), and state agency reviewing psychologist Robyn Murry-Hoffman, Psy.D., affirmed that opinion on September 1, 2023. (Tr. 72-73).

### D.    Consultative Examiner Opinions

On January 17, 2019, consultative examiner Gary Sipps, Ph.D., diagnosed Jordan with major depressive disorder, single episode, with moderate anxious distress. (Tr. 279). Dr. Sipps opined that Jordan had some limitation in his ability to remember and carry out more complex instructions, but no limitations were noted in the domains of concentration, persistence and maintaining pace; social interactions; or adaptation. (Tr. 279-80). Dr. Sipps conducted a second consultative examination on July 19, 2022 and diagnosed Jordan with persistent depressive disorder with moderate anxious distress. (Tr. 355). Dr. Sipps found no functional limitations in any of the domains. (Tr. 356).

### E.    Treating Source Opinions

On December 29, 2022, Christopher Tisdel, M.D., and orthopedic surgeon, opined that Jordan's left ankle limited his activities for work. (Tr. 360). He suggested that Jordan would need to wear his brace while working, and would have to avoid climbing, bending and stooping; would have to limit standing and walking to four hours per shift; and would have to limit his lifting capacity to 20 pounds. (*Id.*). He declined, however, to suggest the retrictions are permanent, as surgery would likely return him to a higher level of activity. (*Id.*).

Dr. Jastrzemski offered two opinions. First, on March 28, 2023, Dr. Jastrzemski opined that Jordan "has significant limitations of use of the left foot which do limit activities for work." (Tr. 475). He determined Jordan was limited to four hours of walking per day and lifting no more than 20 pounds. (*Id.*). He requires an ankle brace for ambulation and is disabled from full time

employment, and this condition may be a permanent issue given its current chronic state. (Tr. 476). In a letter dated April 8, 2024, Dr. Jastrzemski noted diagnoses of bilateral ankle pain and arthritis, chronic pain, history of left ankle injury and morbid obesity with BMI of 50.0-59.9. (Tr. 491). Dr. Jastrzemski wrote that "[d]ue to his instability, and chronic pain, he uses a brace for his left ankle and is prescribed anti-inflammatory medication to reduce pain and swelling." (*Id.*). He noted that Jordan's "ability to ambulate, lift, stand and perform various motions is severely limited, as noted in the functional assessment." (*Id.*).

The functional assessment referenced by Dr. Jastrzemski was performed on August 23, 2023 by AT Michelle Godek, Ph.D., and PT Jamie Hart, DPT. (Tr. 453-59). The findings of the assessment showed Jordan had tolerance for a six hour workday; he could sit for six hours per workday, in 50 minute increments; he could not stand, but could walk one to two hours per workday, if limited to occasional, short distances; he could lift/carry generally consistent with a light exertional level; he could not balance, stoop, crawl, crouch, kneel, squat or operate left foot controls; he could minimally occasionally climb stairs; he could occasionally perform neck flexion and rotation, or operate right foot controls; and he could frequently handle or finger. (*Id.*).

### F.    Post-Hearing Vocational Expert Opinion

Following the hearing, Jordan submitted a Post-Hearing Memorandum objecting to the opinion of the VE based on a review of hearing testimony conducted by a separate VE, C. Kimball Heartsill, MS, CRC, NCC, LMHC. (Tr. 265). VE Heartill opined that while he agreed that the jobs the hearing VE identified as consistent with the ALJ's first hypothetical were appropriate, he noted a significant difference in the job numbers associated with those jobs. (Tr. 268). VE Heartsill derived numbers by utilizing the Job Browser Pro program which bases its

numbers on the Occupational Employment Survey ("OES") from the Bureau of Labor and Statistics. (*Id.*).

Specifically, VE Heartsill opined that there are 1,140 Order Clerk - Food and Beverage positions in the national economy, as compared to 7,000 suggested by the hearing VE. (Tr. 267-68). He believed there to be 5,987 Telephone Quotation Clerk positions in the national economy, as opposed to the 35,000 positions the hearing VE reported. (*Id.*). Finally, CE Heartsill noted 924 Charge Account Clerk positions in the national economy, as compared to the 11,000 cited by the hearing VE. (*Id.*).

VE Heartsill also addressed a question concerning seating given Jordan's height and weight. (Tr. 268). He noted that OSHA recommends employers having seating with capacity of up to 275 pounds. (*Id.*). He further noted that office chairs with capacity of 300-400 pounds, consistent with Jordan's listed weight, typically cost $750 to $1200 or more per chair, considerably more than the typical range of $250 to $500 for a standard office chair. (*Id.*). VE Heartsill therefore opined that the need for the chair with a greater capacity represented an accommodation, and he believed that employers were less likely to hire anyone requiring such an accommodation for an unskilled sedentary position. (*Id.*).

Finally, VE Heartsill provided the following concerning his own qualifications:

> My opinions are based on my 38 years' experience as a Board Certified Rehabilitation Counselor, during which time I have extensive experience completing Job Analysis/Job Descriptions, Labor Market Surveys, completing Trasferrable Skills Analysis, completing earnings/employability assessments, and providing expert testimony as a Vocational Expert in a variety of settings for both plaintiff and defense and I continue serving as a Vocational Expert for Social Security Disability Hearings.

(Tr. 269).

9

### G. Administrative Hearing Evidence

On April 17, 2024, Jordan testified before the ALJ that he was 6'1" and 389 pounds. (Tr. 37). He stated that he was capable of driving for "about 45 minutes or so," and he will then need to stop and use the PRICE method involving protect, rest, ice, compress and elevate. (Tr. 38). He is a high school graduate and he attended some college. (*Id.*). He stopped working in 2017 due to problems with his left ankle. (Tr. 41).

Jordan testified that in 2022 he was having problems walking and was using a cane to ambulate any time he left home. (Tr. 41-42). On a bad day he used a cane to get around his house. (Tr.  42). He also used a brace that fit in his regular boot, and a large gray plastic boot he had from when he broke his ankle in 2006. (*Id.*). He has never had surgery on his foot, but he has been doing physical therapy since 2017. (*Id.*). He takes Tylenol and Meloxicam for pain, and it does give him some relief. (Tr. 42-43).

Jordan further added that in 2022 he was capable of standing for "about a half an hour or so" before he would have to sit down and go through PRICE. (Tr. 43).  He has some swelling in his foot and ankle. (*Id.*). He believes his physical therapy has helped him to maintain the status of his ankle over the last five years. (Tr. 44). He has worn the ankle brace since 2017. (Tr. 45). Jordan believes his mobility and pain are his biggest barriers to working. (*Id.*). He uses his TENS unit for two hours daily. (Tr. 46). He is not capable of doing all of the dishes at one time, he has to take breaks to rest and elevate his ankle. (*Id.*). He does not often leave home to go to restaurants, movies, church or anywhere else. (Tr. 47-48). He does not do many household chores. (Tr. 48).

On questioning by his attorney, Jordan testified that while he will wipe off countertops or the refrigerator, he will not vacuum. (Tr. 49). He has been using the PRICE method since about

2017, but has only been using the TENS unit for about six to eight months. (Tr. 49-50). He does believe he has seen benefit from using the TENS unit in that it has decreased his reliance on medications, although it has not really addressed his pain. (Tr. 50).  He reported that he has lost 50 to 60 pounds by focusing on diet and cardio exercise. (Tr. 51). In addition to attending physical therapy three times weekly, he will do stretches for his ankle on his own. (Tr. 51-52).

Once Jordan concluded his testimony, VE Lynn Smith testified. (Tr. 54-57). VE Smith classified Jordan's past work as security guard, DOT #372.667-034, considered light and semi-skilled with an SVP of 3. (Tr. 55).

For his first hypothetical, the ALJ asked VE Smith to consider an individual of Jordan's age, education, and work history, who is limited to sedentary work with additional limitations to occasional ramps and stairs, but no ladders, ropes or scaffolds; occasional balancing, stooping, kneeling, or crouching, but no crawling; no unprotected heights, moving mechanical parts or operating a motor vehicle; frequent exposure to vibrations. (*Id.*). VE Smith opined that such an individual was incapable of performing Jordan's past work but could work as an order clerk, DOT #209.567-014, sedentary and unskilled, SVP of 2, with 7,000 jobs in the national economy; as a phone quotation clerk, DOT #237.367-046, sedentary and unskilled, SVP of 2, with 35,000 jobs nationally; and as a charge account clerk, DOT #205.367-014, sedentary and unskilled, SVP of 2, with 11,000 jobs nationally. (Tr. 55-56).

For a second hypothetical, the ALJ asked VE Smith to consider the same individual, but with the additional limitation that the individual would need to have a leg elevated while seated. (Tr. 56). The VE Smith opined that there would be no work for such an individual. (*Id.*).  Finally, VE Smith testified that an employer would tolerate no more than ten percent off-task time, and

no more than one absence per month. (*Id.*). VE Smith stated that her testimony was consistent with the DOT. (*Id.*).

Under questioning by Jordan's attorney, VE Smith testified that while she did not know the OSHA weight limit for chairs, she felt counsel's suggestion on 275 pounds "sounded fair." (Tr. 57). She also did not know if anyone over 275 pounds would require a bariatric chair, but testified it "sounds reasonable." (*Id.*). She opined that the use of a cane would not change the availability of the jobs she cited in response the the ALJ's hypothetical. (*Id.*).

## IV.    The ALJ's Decision

In his decision dated May 30, 2024, the ALJ made the following findings:

1.    The claimant last met the insured status requirements of the Social Security Act on December 31, 2022.

2.    The claimant did not engage in substantial gainful activity during the period from his alleged onset date of January 10, 2017 through his date last insured of December 31, 2022 (20 CFR 404.1571 *et seq.*)

3.    Through the date last insured, the claimant had the following severe impairments: osteoarthritis and obesity (20 CFR 404.1520(c)).

4.    Through the date last insured, the claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except that he can occasionally push and/or pull with the bilateral lower extremities. The claimant can climb ramps and stairs occasionally, never climb ladders, ropes or scaffolds, balance occasionally, stoop occasionally, kneel occasionally, crouch occasionally, never crawl. The claimant can never work at unprotected heights, never moving mechanical parts, and never operating a motor vehicle. He can work in vibration frequently.

6.    Through the date last insured, the claimant was unable to perform any past relevant work. (20 CFR 404.1565).

7.      The claimant was born on January 19, 1982 and was 40 years old, which is defined as a younger individual age 18-44, on the date last insured. (20 CFR 404.1563).

8.      The claimant has at least a high school education. (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skill (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a).

11.     The claimant was not under a disability, as defined in the Social Security Act, at any time from January 10, 2017, the alleged onset date, through December 31, 202, the date last insured (20 CFR 404.1520(g)).

(Tr. 21-31).

**V.      Law and Analysis**

**A.      Standard for Disability**

Social Security regulations outline a five-step process the ALJ must use to determine

whether a claimant is entitled to benefits:

1.      whether the claimant is engaged in substantial gainful activity;

2.      if not, whether the claimant has a severe impairment or combination of impairments;

3.      if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.      if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.      if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v)[1]; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears the ultimate burden to produce sufficient evidence to prove they are disabled and, thus, entitled to benefits. 20 C.F.R. § 404.1512(a).

### B.    Standard of Review

This Court reviews the Commissioner's final decision to determine whether it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.*, quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

---

[1] The regulations governing DIB claims are found in 20 C.F.R. § 404, *et seq.* and the regulations governing SSI claims are found in 20 C.F.R. § 416, *et seq.* Generally, these regulations are duplicates and establish the same analytical framework. For ease of analysis, I will cite only to the relevant regulations in 20 C.F.R. § 404, *et seq.* unless there is a relevant difference in the regulations.

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012).

## VI.     Discussion

Jordan brings two issues for this Court's review, arguing:

1.     The ALJ erred at Step 5 by rejecting the vocational opinion of Mr. C. Heartsill; and

2.     The ALJ erred at Step Four and Step Five by creating an incomplete RFC and subsequently finding occupations exist in the national economy.

(ECF Doc. 8, p. 1).

### A.     The ALJ did not err at Step Five by rejecting the vocational opinion of VE Heartsill.

Jordan asserts that the ALJ's reasoning and decision for dismissing the opinion of VE Heartsill, submitted post-hearing, was improper and not supported by the evidence. (*Id.* at p. 6). Jordan notes his counsel's objection to the hearing testimony of VE Smith due to the inaccuracy

15

of the job numbers she provided, and argues that VE Heartsill's job numbers were based on "a more thorough assessment and depiction of actual job numbers available in the national economy." (*Id.* at p. 7). While VE Heartsill determined his statistical data utilizing the Job Browser Pro program, Jordan contends that VE Smith offered no basis for her numbers. (*Id.*).

Jordan further argues that the ALJ's rejection of VE Heartsill's opinion owing to a lack of information about his qualifications is unfounded as VE Hearsill's qualifications are provided in his report. (*Id.*). While the ALJ wrote that there was no information as to whether VE Heartsill "had experience in testifying for Social Security, or whether he used approved methods in determining jobs and job numbers was also unsupported by the record," (*Id.* at pp. 7-8), Jordan notes again that VE Heartsill relied on Job Browser Pro, and quoted from VE Heartsill's opinion:

> My opinions are based on my 38 years experience as a Board Certified Rehabilitation Counselor, during which time I have extensive experience completing Job Analysis/Job Descriptions, Labor Market Surveys, completing Transferable Skills Analysis, completing earning/employability assessments, and providing expert testimony as a Vocational Expert in a variety of settings for both plaintiff and defense and I continue serving as a Vocational Expert for Social Security Disability Hearings.

(Tr. 269). Jordan also argues that an inquiry would show that VE Heartsill is on the active roster of vocational experts who provide testimony before the Social Security Administration. (ECF Doc. 8, p. 8). Finally, Jordan asserts that even if there is precedent for determining there are "significant" numbers of jobs available using VE Heartsill's opinion, the ALJ provided no analysis of VE Heartsill's job numbers in his decision, and Jordan is unable to understand how, or, for that matter, if, the ALJ made such a determination. (ECF Doc. 11, p. 2).

The Commissioner acknowledges that the ALJ "incorrectly noted that Plaintiff did not provide Mr. Heartsill's credentials", but contends that this was harmless error, because even if the ALJ were to have accepted VE Heartsill's job number determination, that would still have

provided "a significant number of jobs in the national economy." (ECF Doc. 10, p. 7). In the Commissioner's view, the ALJ properly noted that there is no "magic number" of jobs in the national economy that qualifies as "significant" for satisfying the fifth step of the disability analysis, rather, it is a fact-specific inquiry based on "many criteria." (*Id.*). In fact, the Sixth Circuit has found as few as 2,000 jobs in the national economy, substantially fewer than VE Heartsill opined were available with the RFC in this case, to be significant. (*Id.*, citing *Taskila v. Comm'r of Soc. Sec.*, 819 F.3d 902, 905 (6th Cir. 2016)). The ALJ contends that the ALJ's failure to determine whether the 8,051 available jobs identified in VE Heartsill's opinion rises to the level of a significant number is harmless error because the Sixth Circuit has determined that the decision of what constitutes significant numbers of jobs "should ultimately be left to the trial judge's common sense in weighing the statutory language as applied to a particular claimant's factual situation." (*Id.* at p. 8, citing *Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988). The Commissioner concludes that the case should not be remanded where Jordan acknowledges over 8,000 jobs in the national economy that he could perform and the Sixth Circuit has held that "[s]ix thousand jobs in the United States fits comfortably within what this court and others have deemed significant." (*Id.* at p. 9, citing *Taskila*, 819 F.3d at 905).

At Step Five of the sequential analysis, the ALJ "determines whether, based on the claimant's residual functional capacity, as well as his age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled." *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 548 (6th Cir. 2004). At this final step of the analysis, the claimant no longer bears the burden of proof; it shifts to the Commissioner who "must identify a significant number of jobs in the economy that can accommodate the claimant's residual functional capacity and vocational profile." *Id.* at 548. If the ALJ asks the vocational

expert whether there is a "discrepancy between [the expert's] opinion and the DOT requirements for the jobs identified," then the ALJ has complied with agency policy for using a vocational expert. *Zimmerman v. Comm'r of Soc. Sec.*, 2019 WL 4736267, at \*6 (N.D. Ohio Sept. 27, 2019), citing *Beinlich v. Comm'r of Soc. Sec.*, 345 F. App'x 163, 168 (6th Cir. 2009). In the Sixth Circuit, "the ALJ is under no obligation to investigate the accuracy of the VE's testimony beyond the inquiry mandated by SSR 00-4p." *Beinlich*, 345 F. App'x at 168. Rather, that "obligation falls to the plaintiff's counsel, who had the opportunity to cross-examine the VE and bring out any conflicts with the DOT." *Id.*

In a post-hearing memorandum, Jordan objected to VE Smith's hearing testimony and offered the expert vocational opinion of C. Kimball Heartsill, who, after reviewing VE Smith's hearing testimony, determined that the occupations VE Smith cited in response to the RFC would account for only 8,000 jobs in the national economy. This was substantially fewer than the 53,000 jobs indicated by VE Smith. (Tr. 267-68). The ALJ wrote in his decision that VE Heartsill's opinion did not include a statement of his expert's credentials, a finding that is inconsistent with the record, and added that he "reject[s] the opinion of the purported expert, Mr. Heartsill, whose qualifications have not been vetted." (Tr. 27). The ALJ also noted, however, that there was no explanation provided "as to why the hearing vocational expert's numbers should be rejected, when this individual is experienced in providing testimony for Social Security hearings, utilizes approved methods for determining jobs and job numbers, and has appropriate professional qualifications." (Tr. 26-27). Notably, when asked during the hearing, Jordan's counsel expressly did not object to VE Smith's qualifications during the hearing. (Tr. 54). Further, during cross-examination, Jordan's counsel did not inquire into VE Smith's method for determining job numbers. (Tr. 56-57). The ALJ ultimately determined:

18

> [T]he vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles. Based on the testimony of of the vocational expert, I conclude that, through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, the claimant was capable of making a successful adjustment to other work that existed in significant numbers in the national economy.

(Tr. 27).

Here, Jordan availed himself of the opportunity to cross-examine VE Smith, but did not address the topic of how she determined her job numbers. (Tr. 56-57). He also submitted a post-hearing memorandum based on the opinion of VE Heartsill to suggest that there were valid concerns about VE Smith's testimony, specifically with regard to her method for deriving job numbers. (Tr. 268). The ALJ was required to consider VE Heartsill's opinion, but was not required to "memorialize every discrete component of the decisional process." *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x. 496, 508 (6th Cir. 2006). The record shows that the ALJ considered the testimony of VE Smith, and acknowledged her credentials, experience and methodology for determining job numbers. As VE Smith asserted that her opinion was consistent with the DOT, which continues to be recognized as "a reliable source of job information," *O'Neal v. Comm'r of Soc. Sec.*, 799 F. App'x 313, 318 (6th Cir. 2020), there is substantial evidence to support the ALJ's finding that Jordan could perform work that existed in significant numbers in the national economy. *See also Luna v. Soc. Sec. Admin.*, 2020 WL 5549318, *16 (N.D. Ohio Aug. 28, 2020).

Although the ALJ was clearly misguided in suggesting that VE Heartsill's credentials were not provided, this rises only to harmless error, because he was justified in relying on VE Smith's testimony to determine the appropriate job numbers. Jordan askes the Court to choose between differing vocational opinions, but doing so would require this Court to substitute its judgment for that of the ALJ, an exercise beyond its purview. As substantial evidence exists in

support of the ALJ determination to rely upon the testimony of VE Smith for the dtermination of job numbers, I cannot recommend remand on this issue.

> **B.    The ALJ erred at Steps Four and Five by failing to articulate why he did not include a requirement for a specialized bariatric chair in the residual functional capacity.**

Jordan argues that the ALJ erred by not accounting for all necessary limitations in the final RFC. (ECF Doc. 8, p. 11). Specifically, Jordan contends, given his weight and the vocational evidence, that the ALJ should have included a requirement for a specialized bariatric chair, a restriction that would have eliminated all competitive work in the national economy. (*Id.*). Jordan notes that his weight never fell below 387 pounds during the relevant period, and that VE Heartsill opined that a specialized bariatric chair would be necessary under OSHA standards for anyone exceeding 275 pounds. (*Id.* at p. 9). He further notes that while VE Smith testified she was unsure of whether anyone over 275 pounds would require a bariatric chair, she indicated, "I mean it sounds reasonable." (*Id.*). Jordan asserts the ALJ is not vocationally trained, and without vocational testimony he therefore cannot make the determination of whether the requirement of a bariatric chair is an accommodation in the work setting. (*Id.*). Jordan also references the ALJ's determination that the bariatric chair would not be a "significant" accommodation, arguing that the standard is not whether an accommodation is "significant" but rather whether it precludes competitive work. (*Id.* at pp. 9-10).

The Commissioner responds that while VE Smith indicated she did not know the specific weight requirements for standard office chairs, she also did not indicate that providing a specialized bariatric chair would be an accommodation. (ECF Doc. 10, p. 9). According to the Commissioner, there was no error in the ALJ weighing the competing testimony of two vocational experts, and finding one more persuasive than the other. (*Id.* at pp. 9-10). Further, per the Commissioner, there is no opinion evidence in the record to support Jordan's contention that

he would require a special chair. (*Id.*). Finally, the Commissioner argues that VE Heartsill does not have medical training to allow him to determine whether a bariatric chair was necessary. (*Id.* at pp. 10-11).

Jordan, in his reply brief, disputes the Commissioner's characterization that there was disagreement between the opinions of VE Heartsill and VE Smith. (ECF Doc. 11, p. 3). Jordan notes that VE Smith's testimony indicated she did not know at what weight the requirement for a specialized chair would be required and argues she therefore rendered no opinion, leaving that of VE Heartsill unchallenged. (*Id.*). He also contends there is ample objective evidence in the record that his weight did not drop below 387 pounds throughout the time in question, and would therefore require a bariatric chair, according to VE Heartsill. (*Id.* at p. 4). Jordan claims he has met his burden under the regulations to show that he would require an accommodation eliminating his ability to work in a competitive environment. (*Id.* at pp. 4-6).

In his decision, the ALJ writes that "[a]lthough the claimant suffers from obesity, there is no medical evidence that it imposes any mobility or functional limitations beyond those set forth and incorporated into the residual functional cacity assessed herein." (Tr. 23). He further notes that "[n]o treating or examining physician has indicated that the claimant's obesity has any significant exacerbating effect on his other impairments." (*Id.*). He does not address obesity again until noting that VE Heartsill "argues that the claimant's weight of over 375 pounds requires an accommodation for sedentary work, as the OSHA regulations recommend seating capacity of up to 275 pounds before a specialized chair is required." (Tr. 26). While he does not specifically addresses how he evaluated VE Heartsill's opinion relative to the need for a specialized chair, the ALJ wrote that he "reject[s] the opinion of the purported expert, Mr. Heartsill, whose qualifications have not been vetted." (Tr. 27). Again, this reason for dismissing

VE Heartsill's opinion is inconsistent with the record, as VE Heartsill's qualifications were clearly provided with his opinion. (Tr. 269).

As noted above, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d, at 877. Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012). The ALJ has failed here to build the logical and accurate bridge to help instruct the claimant and reviewing courts how he evaluated VE Heartsill's opinion, and, specifically, how he determined that there was no need for a requirement for a bariatric chair.

During cross-examination, Jordan's counsel established that VE Smith was not aware of OSHA standards for weight capacity of office chairs. (Tr. 56-57). Further, VE Smith testified that the 275 pound weight capacity limit suggested by counsel to be the standard "sounds reasonable". (Tr. 57). Thus, it cannot be said that VE Smith offered an expert opinion regarding the need for the requirement of a specialized chair in the RFC. Her statements, admitting ignorance on this topic, could not serve as a basis for addressing the issue of a specialized bariatric chair.

Conversely, VE Heartsill offered a clear opinion that such a need was mandated by the capacity for standard office chairs, and that a requirement for the specialized chair would rise to an accommodation due to the additional expense this would impose on an employer. (Tr. 268). He further added:

> [Jordan] will be competing with individuals that do not require
> accommodation with a seating capacity greater than an average office

22

chair. In my experience employers looking to fill unskilled sedentary positions are less likely to hire an individual requiring any accommodation which would lead to any additional employer cost. In my vocational opinion Mr. Jordan will be at a disadvantage when competing with other idividuals that do not require an accommodation for unskilled sedentary employment.

(Tr. 268).

The only reason the ALJ offers for not addressing VE Heartsill's opinion, or the necessity of a specialized chair to support someone of Jordan's size, is the false premise that the record does not provide VE Heartsill's qualifications. (Tr. 26-27). No meaningful guidance is provided by the decision as to how the ALJ considered VE Heartsill's declaration that a specialized bariatric chair was required, and that this rose to the level of an accommodation, nor is there discussion of VE Smith's lack of knowledge on the topic. As the only justification for the ALJ's determination relative to the specialized chair is meritless, Jordan and reviewing courts are left to only speculate as to the ALJ's reasoning. This does not rise to the level of a logical and accurate bridge.

Jordan contends that an immediate award of benefits is appropriate in this case, rather than a remand to the ALJ for further consideration, because all of the essential facts have been resolved and the record adequately establishes his entitlement to benefits consistent with the fourth sentence of 42 U.S.C. §405(g). I disagree with the notion that all of the factual issues have been resolved. There remains the question of whether a specialized bariatric chair is required, and, if so, the impact that such a requirement would have on job numbers. Accordingly, I recommend that this matter be remanded for further consideration of this issue.

## VII.   Recommendation

Because the ALJ failed to apply proper legal standards in determining whether Jordan required a specialized bariatric chair as part of his residual functional capacity, and the impact

that determination might have at Steps Four and Five of the sequential analysis, I recommend

that the Commissioner's final decision denying Jordan's application for disability insurance

benefits be vacated and that Jordan's case be remanded for further consideration of that issue.

The Administrative Law Judge need not reconsider the remaining issues Jordan raises.


Dated: November 20, 2025

Reuben␣J. Sheperd
United States Magistrate Judge


_____

## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party

may serve and file specific written objections to the proposed findings and recommendations of

the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C

636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo by the

assigned district judge.


***


Failure to file objection within the specified time may result in the forfeiture or waiver of

the right to raise the issue on appeal either to the district judge or in subsequent appeal to the

United States Court of Appeals, depending on how or whether the party responds to the report

and recommendations. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be

specific and not merely indicate a general objection to the entirety of the report and

recommendation; "a general objection has the same effect as would a failure to object." *Howard

v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991) Objections should focus on

specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act." *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, 2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interests of justice. *See United States v. Wandashega,* 924 F.3d 868, 878-79 (6th Cir. 2019)